## STAR v. STAR.

No. 12290—Opinion Filed Oct. 23, 1923.

Rehearing Denied Dec. 26, 1923.

1. **Trust—Resulting Trust—Sufficiency of Evidence.**

The evidence necessary to establish a resulting trust in title to real estate must be clear, full, cogent, and satisfactory. The record in this case held to be sufficient to comply with the rule and sustain the judgment of the court.

2. **Same—Witnesses—Competency — Husband and Wife.**

Where the plaintiff alleges a resulting trust in her stepson in an action to recover real estate by the agency of her husband in using her money and buying land in the name of the stepson instead of her name, he is not a competent witness to deny the agency alleged, either directly or indirectly, or to deny that the money used in buying the land was her money.

3. **Appeal and Error—Harmless Error— Instructions in Equity Case.**

In a case of equitable cognizance tried to a jury, their verdict is only advisory, and if approved by the court and incorporated in the judgment, is the finding of the court as to the facts in the case; and where the court instructs the jury that the plaintiff must make out the case by a preponderance of the evidence, when he should have said the evidence must be clear, cogent, full, and satisfactory, and the evidence comes up to the standard as the court should have stated, and the verdict is general and for the plaintiff, the error is harmless.

(Syllabus by Threadgill, C.)

Commissioners' Opinion. Division No. 3.

Error from District Court, Grady County; Will Linn, Judge.

Action by Mrs. Lillie Star against Jacob Star, a minor. Judgment for plaintiff, and defendant brings error. Affirmed.

Barefoot & Carmichael, for plaintiff in error.

Bond, Melton & Melton, for defendant in error.

Opinion by THREADGILL, C. The defendant in error was plaintiff and the plaintiff in error defendant in the trial court and for brevity and convenience will be referred to in this opinion as in the court below.

The appeal is by the defendant from a judgment rendered by the district court of Grady county and in favor of the plaintiff for title and possession to a 140 acre tract of land, being tract number 538, sold on November 12, 1912, in Grady county, and described as: N.E. 1-4 of N.E. 1-4 of N.E. 1-4; S. 1-2 of N.E. 1-4 of N.E. 1-4; S.E. 1-4 of N.E. 1-4; N.E. 1-4 of S.E. 1-4; E. 1-2 of N.W. 1-4 of S.E. 1-4; S.W. 1-4 of N.W. 1-4 of S.E. 1-4; of section 21, T. 6, N., R. 6 W. of Indian Meridian.

The plaintiff claimed that she and Ben Star, the father of the minor defendant, were husband and wife in 1912, and she furnished him money with which to buy land at the said land sale, and he used her money in buying this tract of land but in the name of his son Jacob Star, who was her stepson, and at the same sale he bought a 30 acre tract of land in her name; that the first payment was $446.25. that on June 3, 1913, the plaintiff paid $449.56, principal, and $69.76, interest, that on February 2, 1918, she paid $222.05, and on May 29, 1920, she paid $909.19, being the balance due the Government on the purchase price, and interest, of said land.

That she could not read or write, only could write her name, and did not know until 1917 that all of the land was not purchased in her name; that a patent was issued to said 140 acres of land to Jacob Star instead of being issued to her.

That the defendant Jacob Star had no equitable interest in said land, and the legal title vested in him by issuance of the

patent was held in trust by him for the use and benefit of the plaintiff.

Legal service being had upon said minor, a guardian ad litem was appointed to represent him in the action, who filed a motion to make more definite and certain the petition, and also filed a demurrer, and the same being overruled, filed an answer in which he admits that the land was bought by B. D. Star, but denies that the plaintiff paid any part of the purchase price, and states further that, if she did make the last payment of $909.19, it was wholly voluntary on her part, and that she did not acquire any right, title, or interest in the land by such payment. The answer further states that B. D. Star, the father of the defendant, purchased the said tract of land for the use and benefit of the defendant, and the money paid for said land, except the last payment, belonged to B. D. Star, and the plaintiff had no interest in it; and he contends that he is the owner of the legal and equitable title in the said 140 acres of land, and asks that the plaintiff's claim be denied and canceled as a cloud upon his title, and that the title of the land be quieted in him.

The plaintiff filed a reply consisting of a general denial and restated the payments she made on the said tract of land. The cause was tried to a jury on January 28 and 29, 1921, and the jury returned a verdict in favor of the plaintiff, and the court rendered judgment in favor of the plaintiff and the defendant brings the cause here by petition in error and case-made for review, alleging 13 assignments of error which are considered and urged under one proposition:

"The allegations of the petition are not supported by the evidence and the evidence is insufficient to sustain the verdict of the jury and judgment of the court."

1. The cause was tried on the theory that if the defendant's father bought the land with the plaintiff's money in the name of his minor son, and the patent was issued to him, there would be a resulting trust in favor of the plaintiff, and to make out this character of case it is a well established rule that the testimony must be clear, full, and satisfactory, and of such character as to disclose the exact rights and relations of the parties. Hayden et al. v. Dannenberg, 42 Okla. 776, 143 Pac. 859; Hope v. Bourland, 21 Okla. 864, 98 Pac. 580; Moore v. Adams et al., 26 Okla. 48, 108 Pac. 392; R. C. L. volume 26, p. 1231.

The defendant contends that the plaintiff's evidence was not sufficient to make out this sort of case according to the authorities above cited. This brings us to an examination of the evidence.

The plaintiff testified that she came from Russia to Memphis, Tenn., about June, 1908, when she was a young woman about 21 years of age, obtained employment in a tailor's shop where men's clothing was made, changed, or repaired, as a seamstress, and her wages at first were about $12 a week, which in a short time, increased to $25 to $40 a week, and continued so up to the time she married in 1911, and her board and lodging were only $3 a week; that she saved her money and kept it on her person as she had no knowledge of banks and how to deposit money for safe-keeping; that she met Ben Star about May, 1911; he was a native of Russia and spoke her language and was educated in English; and she married him about August 25, 1911; he ran a secondhand clothing store; he had been married before. She had saved her money and had about $1,700 at the time she married, which was deposited in the Central State National Bank of Memphis, May 8, 1912, on the assurance and direction of her husband that it would be safe. She knew that her husband had been married before, and when he came to see her before they were married he would bring his little boy Jacob with him, and she became very much attached to the child, and after they were married she helped him take care of the child and was a mother to him and continued to work and save money. She introduced the statement from the bank showing her account from May 8, 1912, to May 25, 1917, showing deposits amounting to $1,746 and withdrawals by check to balance.

After they married, in 1912, in November, they decided that her husband should come to Oklahoma and buy a farm or buy land at the Indian land sale being advertised at that time, and they would go out of business in Memphis and move to Oklahoma and make a farm and live on it, and for this purpose she gave a check for $600 which her husband cashed and came to Grady county and bought the land in controversy, making the first payment on it, which was $446.25. The check was introduced in evidence and the receipt of the special disbursing agent of the department of Commissioner to Five Civilized Tribes, dated August 12, 1912, was introduced in evidence, showing the land was bought in the name of the minor defendant, Jacob Star. At the same time her

husband bought 30 acres of land in her name and the receipt showing first payment was introduced in evidence. In July, 1913, she received a notice from the Commissioner to the Five Civilized Tribes to Jacob Star in care of Mrs. Lillie Star which said:

"Madam: This office is in receipt of your remittance tendered to apply on the purchase price of certain unallotted lands as follows:"

—then the formal statement that the amount to be paid was $449.56, and interest to date $15.06, making a total of $464.62, and the balance due on said tract $889.19 to be paid within 24 months from the date of sale at six per cent. interest, and this statement was introduced in evidence. A check dated May 31, 1919, to the order of J. G. Wright, Commissioner to Five Civilized Tribes for $452.18, bank number 7065, signed by Mrs. Lillie Star, and indorsed "paid June 9, 1913," was introduced in evidence; also, a letter, dated December 1, 1916, addressed to Mrs. Lillie Star, Memphis, Tenn., acknowledging remittance of $158.85, paid on the said land, and other receipts from the same department for payments made, addressed to Mrs. Lillie Star, were introduced, and finally the patent executed in the name of the minor defendant, Jacob Star, and sent to the plaintiff, and she states that she made the last payment on the land, being the sum of $909.19. She could not read nor write until after she married, and her husband taught her how to write her name, and she did not know until 1916 that this tract of land was bought in the name of the minor defendant. In 1913 they moved to Oklahoma and undertook the adventure of farming and improving the 140 acre tract of land but they were not accustomed to farming and soon became dissatisfied and rented the farm out and moved to town. In the meantime, and during the first year of their marriage, she had a little girl born to her, and after they moved off of the farm in Oklahoma they had some domestic misunderstandings, and after a trip to Rochester, N. Y., and moving about for about two years they went back to Memphis, he first and she following, and then he refused to live with her, she says that he "threw her down," and she sought employment in the same sort of work she had always followed, the work of a seamstress, and made $35 a week for six years up to the time this cause was tried in the district court, and had saved her money. This is the substance of the plaintiff's testimony. It consists not only of her verbal statements but

she is corroborated by statements from the bank and communications from the Commissioner to the Five Civilized Tribes.

The defendant demurred to this testimony on the ground that it was not sufficient to make out the plaintiff's case. The court overruled the demurrer and the defendant excepted. We think the testimony is amply sufficient against the demurrer. It consists not only of the verbal statements of the plaintiff but of records corroborating her testimony.

The defendant offered testimony to discredit the testimony of the plaintiff. J. Schnitzer, a witness for the defendant, said he was a married man, lived in Memphis about 12 years and knew Ben Star, worked for him seven years and partner with him nearly two years, said that Ben Star transferred his business and property to his wife in 1911, or 12, because he had trouble in a lawsuit; said there was a judgment against him for $5,000 and he was "scared he was going to lose everything." He said that he knew Star had money and he believed that he gave his wife money to deposit in her name, and he did not believe she had any money before she married Ben Star, said he knew her before she married and she told him one day, "she had not got much money, a little bank account," said she took a trip before she married and spent what money she had and Star said she came home broke, and she transacted business in the North Memphis Bank before she married, and she had about a hundred dollars or something like that, said Star had money before he married, and that he heard Star give as his reason for transferring the property and money to his wife that he wanted to save up for the children, wanted to protect the children, said he was going to give up business and go to farming, said he believed he came to Oklahoma about 1912, to buy some land and said he was going to buy it for his children, and after his trip to Oklahoma he came back to the store and talked to him about it in the presence of his wife and said he had bought 140 acres for Jackey and 30 acres for his wife, said he saw the papers and they were shown to him in the presence of the plaintiff, said his wife "never said nothing," heard her say one day, "she got 30 acres out there," said when Mrs. Star drew money from the bank he thought Mr. Watkins did the writing for her, said when they left Memphis for Oklahoma that he heard her say they were going to live on the 140 acres, Jake's place. Mrs. Mary A. Watkins testified by deposition that she had lived in Memphis 20 odd years and knew

Ben Star about 14 years and Mrs. Lillie Star about seven years, met her just before she and Ben Star married. They married in 1911, in August sometime, and lived next door to where she and her husband lived for about two years, and she knew Ben Star's children by his first wife, Jake Star and Izzey Star, said the children lived with her for about four years. She knew when Ben Star was sued for damages in the circuit court of Selby county, Tenn., in 1911, and she not being allowed to tell what the judgment was, a copy of the judgment was introduced showing that Rosa Chapiro obtained a judgment against him by a verdict of the jury and consideration of the court on February 14, 1912, for damages in the sum of $5,000; said Mrs. Star and her husband were intimate friends of her husband, and they were good neighbors, and they were worried about the judgment, and that Ben Star turned over everything to his wife and wound up his business and said he was going to buy a place for his children and make some use of his money, said Ben Star and his wife would often talk their affairs freely in their home and she sometimes got tired of it, said she married Ben Star because she wanted to quit work, she was tired of working for nothing and she was a poor working girl, said she heard her say she had only $40 before she married, said her husband signed her checks for her in drawing money from the bank, said Ben Star brought the papers home showing that he bought 140 acres of land in Oklahoma for Jake and 30 acres for his wife, and showed these papers in the presence of his wife, and when they moved away to Oklahoma she heard them say they would improve the 140 acres first and then her 30 later on, said she objected to this and wanted her 30 acres improved first, said she heard her talk about why she moved away from Oklahoma when she came back to Memphis, said she was tired of the country and did not want to live on the farm, that she wanted to live in the city, that she was not going to spend her best days improving a farm for somebody else's children, that Jake could have the farm, that she did not want it, said she told her "out of her own mouth she had $40 when she married, she expected Star had a whole lot but she was very much disappointed that he did not have it."

Harry Madison testified by deposition that he knew the parties and was a friend to Ben Star, and in the presence of Lillie Star, Ben asked him to advise him what to do about a judgment that was against him, and he advised that he should turn over his property and his money to his wife, said that he owed Ben Star $1,500 and that he wanted to get rid of it and settle with him, and he advised him to put it in the bank in his wife's name, said he had owed the money 8 or 12 months, said when he returned the $1,500 to Ben Star his wife was present, and that the date of the return of this money was about May the 8th or May 7th, and they deposited it in the Central State National Bank, said he heard Ben Star talk in the presence of his wife about buying the land for his children and this was after he came back from Oklahoma and had been to Rochester, N. Y., and he told him he had bought two places in Oklahoma, 30 or 40 acres for his wife and he had bought 100 acres for his son Jake, and at that time he said she did not claim the 140 acres, and that she was well satisfied with the transaction, said he knew that Ben Star had about $3,500 in cash money. This testimony was not corroborated by note, paid check or any instrument of writing.

J. T. Watkins testified that he knew Ben Star and his wife and were special friends, said he knew about Rosa Chapiro suing him for damages, and the judgment against him, and he had heard Ben Star and his wife talk about it, said this was in the early part of 1912, said she was a lady and stayed at home a great deal, she didn't run around and he never saw her out much, said he heard Ben Star say something about money he had loaned out and he thought it was about $1,500, and Mrs. Star was present at the time he said this, said he heard them speak of depositing the money in the bank to get away from the $5,000 judgment, said he wrote some for Ben Star and some for Mrs. Star, said she could sign her checks all right but she couldn't write them but he would write the checks for her, said he wrote small checks for her, several checks were presented to him for him to identify which he could not, one to J. George Wright, Commissioner to the Five Civilized Tribes, said he did not write it, that the checks he wrote were small checks for small amounts and on white paper, said he wrote checks to pay the interest on the money due for the land, but did not remember the amount, they were not in the bunch of checks presented to him, and the witness had about the same discussion of the land how it was bought as his wife, Mrs. Watkins, and he heard her say about the same about her money affairs as his wife heard. He testified that she got him to write the Government about the last payment, and said he,

supposed she had gone to work and was making money and wanted to pay the land out and, if she could give a deed to it it would be hers and he wrote for her. He said he knew the witness, A. J. Schnitzer, and that he had a second-hand furnishing goods store, that he was a Jew, and he knew the witness Harry Madison and that he used to be in the saloon and grocery business, said he was a Gentile, said he did not meet Lillie Star till about the first of 1912, and that she could speak English then, but "she never was a green horn," said he had no interest in the lawsuit, but he was sent over from Memphis to testify in the case by a Jew lawyer, that he had given his deposition, but he came to testify in person; said Joe Havoner was the lawyer he referred to.

The defense then offered Ben Star, the husband of Lillie Star, and the father of the minor defendant, as a witness, and after preliminary questions his competency was questioned by the plaintiff and he was not allowed to testify. This was in substance all the testimony of the defense.

In rebuttal the plaintiff denied the conversations testified to by the witness Schnitzer, denied that she and Ben Star ever talked about the $1,700 in the presence of other parties. She said the partnership investment amounted to only about $75 each, and the partnership bank account was only about $150, and she and Schnitzer signed some small checks on this account together. She denied that she ever talked with Watkins about the money or land belonging to her, only she asked him to write a letter for her to the government about her paying the land out, she showed him the papers her husband had turned over to her, and he read and explained them to her. When she had a letter to the government she went to see a lawyer and she told Watkins about this, said she never talked to Schnitzer about her money before she married, never talked to anyone about it, she denied telling Mrs. Watkins that she had only $40, and she denied being acquainted with the witness Madison, denied any conversations in her presence between her husband and this man, and declared she did not know him.

The defendant contends in his brief that the testimony of the plaintiff is unreasonable. We have taken the pains to examine the entire record and we think her testimony is far more reasonable than the testimony of the defendant. Her story is corroborated by record testimony, she was an experienced seamstress, young, strong, and used to hard living, and being among strangers in a strange country she would be disposed to economy and saving, and if her story was not true about the money deposited in the Central State National Bank being her money some bank official would have known about it or some good reason could have been given for the bank's lack of knowledge in the matter, and there was no effort to impeach her testimony by information defendant claims was given the bank at the time the deposit was made. The story of the witness that Ben Star put the money and property in her name to defeat a $5,000 judgment against him by a young girl who sued him for damages, and that all this was talked to the neighbors is far more unreasonable than the plaintiff's story, because if Ben Star transferred his property to his wife to defeat the judgment upon the advice of his friend Madison, it is passing strange that Madison did not warn him and his wife that they must keep the matter quiet; they would not have dared to tell the bank or their friends, knowing that in a contest the bank and the friends might be called in as witnesses against them and they would lose it all. It would be more reasonable that he would have intrusted the money to his wife's personal keeping than the story as they tell it. The witness Madison says he owed Star $1,500 and paid him about the time the deposit was made in the bank, but there is no note or check or instrument of writing to corroborate this indebtedness or the payment, and this witness is sure that his friend Star had about $3,000 in cash at that time. This testimony is so unreasonable that it sounds to us like a frame-up; he testified for his friend. It would be beyond belief that Star had $3,000 in cash and put $1,700 in the bank in his wife's name to save it from the judgment and keep the $1,300 out or deposit it somewhere else without telling about it in the testimony.

Then, again, it is not denied that the plaintiff made the last payment on the land of $909.19, and while she was making this money after her husband left her she had to take care of her child, and yet in the course of about three years she is able to save enough money from her wages at $35 a week to meet this payment. This part of her testimony is not contested, and yet it is no more unreasonable than her testimony that she worked and saved the $1,700 before she married and before she had a child to look after.

The testimony of the defense that the first money spent for the land was money belonging to Ben Star deposited in the bank

in his wife's name to defeat a judgment for damages in favor of a woman discredits itself. It comes from a dishonorable course and expires among its votaries.

We think the evidence **sufficiently strong** and conclusive to support the judgment and satisfy the rule in such cases.

2. The defendant contends that the court committed error in holding that Ben Star, the husband of the **plaintiff**, was incompetent to testify for the defendant.

This depends upon whether or not he is excluded under section 589, Compiled Stats. 1921, which reads as follows:

"The following persons, being incompetent to testify: * * *

"Third. Husband and wife for or against each other, except concerning transactions in which one acted as the agent of the other, or when they are joint parties and have a joint interest in the action; but in no case shall either be permitted to testify concerning any communication made by one to the other during the marriage, whether called while that relation subsisted, or afterwards."

The witness took the witness stand and was questioned about his relationship to the plaintiff, and stated she was his wife, and that they married in August, 1911; then he was asked about the business he was engaged in in Memphis and when he moved to Oklahoma and he answered; and he was asked further about the business he was engaged in when he married the plaintiff, and was permitted to answer over the objection of the plaintiff; then he was asked how much stock he had in the second-hand clothing business he was engaged in and this was objected to on the ground the witness was not a competent witness and the objection was sustained, and there were no other questions asked him. The record shows that they then left the jury and the courtroom and went into chambers, and that counsel for defendant stated to the court what he expected to prove by the witness; that if the witness were permitted to testify he would state that he deposited $1,700 in the Central State National Bank & Trust Company, May 8, 1912, in the plaintiff's name and that this money belonged to him, collected from notes which were due him prior to the time of his marriage with said plaintiff, that the money was deposited in the name of Mrs. Lillie Star for the purpose of placing it beyond the reach of Rosa Chapiro, who held a judgment against him for $5,000; that the witness would further testify that all the checks drawn by the plaintiff on said account were drawn by her as the agent of the witness and at his request; that witness would further testify that all of the payments made to the Government on the 140 acres of land in controversy were made out of the funds belonging to him, and the funds were deposited in the name of said plaintiff in the said bank with the exception of the final payment made in 1920. But there were no questions propounded to the witness on the witness stand before this record was made out **of the presence** of the jury or after it was made in the presence of the jury as to agency.

The agency claimed by the witness and by what counsel **for the defendant** offered to prove was not involved in the controversy before the court, but was an agency in fraud of a legal judgment, and its purpose was evidently to destroy the agency in issue, and it would not have much standing in a court of equity for any purpose even if the witness were otherwise qualified. 16 Cyc. 145. The agency claimed by the plaintiff is the implied agency of the husband in using her money and buying land for her use and benefit. This agency he could not dispute under the rule directly or indirectly; he could only qualify and testify to any fact or state of facts growing out of such agency. It is not the agency itself that comes within the exception of the statute, but the transactions growing out of the agency. Her husband could have stated how he performed or failed to perform the services of the agency in issue, but he could not deny that the money he drew on her check was her money because this would be testimony beyond the range of the agency in issue, this could only be permitted under the second provision of the exception where the husband and wife are joint parties and have a joint interest in the action, but where, as in this case, the husband has no legal interest and is only acting as a witness, the scope of the rule cannot be broadened beyond the limits of the statute itself. If he concedes the agency then he may testify, if he does not concede it that is the end, and he cannot testify.

As suggested by counsel for plaintiff the issue tendered by the testimony of the husband as to the ownership of the money could not be a matter where the fact of the agency could enter and the ownership of the funds was a fact that could be established by evidence of the plaintiff and the testimony of the husband contradictory to such fact could not be offered behind the cloak of his agency under the rule. This construction of the statute is not in con-

flict with the cases **cited by the defendant**: Okla. Natural Gas Co. v. Crenshaw, 91 Okla. 269, 217 Pac. 370; Treiber v. McCormack, 90 Kan. 677, 136 Pac. 268; Douglas, Sheriff, v. Hill, 29 Kan. 527; Brownell v. Moorehead, 65 Okla. 218, 165 Pac. 408, and is supported by authorities cited by the plaintiff: Carvey v. Gleissner (Wis.) 17 N. W. 398; Taylor Commission Co. v. Bell et al. (Ark.) 34 S. W. 80; Berlin v. Cantrell, 33 Ark. 611; Phipps v. Martin, 33 Ark. 207.

3. The defendant further complains of certain instructions given by the court, and his complaint is as follows:

"The court tells the jury that if the plaintiff furnished B. D. Star with $600 or any amount of her own funds, under instructions for said B. D. Star to purchase land at the government sale, and in pursuance of such instructions B. D. Star did purchase land and the plaintiff afterward paid the balance of the purchase price thereon, then the law would be for the plaintiff, and they should so find; and in the instruction set out in the tenth assignment of error, the court tells the jury that if they believe from the evidence in the case that $600 delivered to her husband, B. D. Star, for the purpose of purchasing land, was the money and property of her husband, B. D. Star, and not the money of the plaintiff, then the law would be for the defendant, and the jury should so find. And the court instructed the jury, as shown by the eleventh assignment of error, as follows:

"In this case, gentlemen of the jury, the burden of proof is upon the plaintiff to prove each and every material allegation in her petition alleged necessary to show her right to recover herein, by a preponderance of the evidence. By a preponderance of the evidence is meant the greater weight of the evidence."

The objection goes to the intensity of the rule that not more preponderance is required, but clear, full, cogent, and convincing, is the requirement.

It must be remembered that this is an equity case and the jury was used by the court in an advisory capacity, and the verdict must meet the approval of the court to be incorporated in the judgment. It appears that the court approved the verdict and made it a part of the judgment rendered in favor of the plaintiff, and this court in passing on the evidence will consider the whole record to determine if the evidence comes up to the rule required in the particular case. Mendenhall v. Walters, 53 Okla. 598, 157 Pac. 732.

And although the instructions complained of were not in compliance with the intensity of the rule required, still if the record

shows the proof sufficient to make out a case, clear, unequivocal and decisive, the error complained of would be harmless. We recognize the high standard of proof required; that title to real estate cannot be overturned by a bare preponderance of oral testimony seeking to establish a trust in opposition to written instruments, but the record in this case furnishes ample proof by parol, corroborated by written instruments, clear, cogent, and convincing, of a resulting trust in favor of the plaintiff, and it would have been error for the court to have rendered any other judgment based upon this record. We therefore recommend that the judgment of the lower court be affirmed.

By the Court: It is so ordered.